MELVIN, Judge.
The appellant/defendant seeks review of a judgment and sentence rendered November 12, 1976, based upon a jury verdict, adjudging him to be guilty of murder in the second degree and imppsing a sentence for the remaining period of his life.
The indictment upon which James Anderson came to trial charged him in one count with the' unlawful death of Littleton McPherson and Henry Rouser, Jr., by shooting them with a pistol. The State filed a bill of particulars designating that the offense occurred April 13, 1976, between 12:00 noon and 4:00 p. m.
The sole question presented here is whether the record reflects sufficient testimony to sustain the verdict of the jury and the judgment and sentence imposed by the trial court. It does.
It was about 10:00 a. m. on the morning of April 14,1976, when the bodies of Little-ton McPherson and Henry Rouser, Jr. were found in an area near Thigpen Road in St. Johns County, Florida. The pathologist testified that the cause of the death of each man was multiple gunshot wounds to the head and chest. Based upon his analysis of the food in each victim’s stomach, the pathologist placed the date of death as being April 13, 1976, between the hours of 12:00 noon and 2:00 p. m.
The officers found dice, cigarette butts and various sums of money scattered around in the area where the bodies lay. Although the pants pockets of each man had been pulled out, the officers found the sum of $51 in cash in victim Rouser’s front pocket. No identifiable fingerprints were found at the scene of the crime.
The defendant is the nephew of Sherman and Betty Robinson, and he formerly lived in their home. Sherman Robinson testified that he owned a .22 caliber German pistol and two boxes of long-range .22 caliber bullets that he kept at his wife’s house. At one time while defendant was living in the Robinson home, Betty Robinson took from his pants one of the two boxes of shells. Betty Robinson testified that the pistol and one box of shells was under the mattress on Monday, April 12, and one box of shells was in a dresser drawer. On April 14, she discovered the pistol was missing. She further testified that the defendant was at her home on Monday, April 12, and tried to borrow $2.00 from her. He stated to her that he had won over $400 gambling with Rouser and McPherson, and that he was going to get some more money from them. It was her testimony that the defendant came to her house on Tuesday, April 13 to pick up a pair of slacks, that the defendant entered the house alone and came out with the slacks folded under his arm. She did not know if he took the pistol and shells.
A deputy sheriff testified that on the afternoon of April 14, 1976, he questioned the defendant after first advising him of his Miranda rights. The deputy testified that the defendant stated that on the previous day he had been to his aunt’s house around 12:15 p. m. and picked up his pair of pants. He told the deputy that no one was at home at that time. He stated that shortly before 1:00 p. m., he met Rouser at “Bea’s Place” and drove with him to where McPherson was staying. He then related that he rode with the two men a short way, and paid them some money he owed them. He stated to the officer that he got out of their car in the City of Hastings, and had no further contact with them.
*397 The bullets were removed from the body of each victim and a Federal Bureau of Investigation Firearms Expert testified that he did a neutron activation analysis of those bullets. He then did a comparison analysis of the bullets remaining in the box of ammunition removed from the residence of Betty Robinson and concluded that the bullets removed from the body of each victim and the bullets remaining in the box of shells came from the same source and contained the same elemental composition. The officer stated that there would, of course, be many thousand bullets all over the country which would contain the same elemental composition as the nine expended bullets. However, it was his opinion that the bullets removed from the bodies and the bullets remaining in the box all came from a common source.
The State presented the testimony of James Gilmore and James Howard who stated that they were driving near the Thigpen Road around 1:00 p. m. on April 13 and that they observed the defendant, running on Thigpen Road, waving and motioning for them to stop. They gave the defendant a ride into town. During the time that the defendant was with Gilmore and Howard, the defendant showed them a roll of money and some dice, which he said were crooked dice. According to the testimony, later that same afternoon, the defendant purchased a used car and paid $150 in cash on the transaction.
The trial court denied defendant’s motion for a directed verdict. The defendant testified that he had gone to his aunt’s house about noon on April 13 and picked up a pair of trousers. He stated that he did not take a pistol from the Robinson house. It was his testimony that after he left the Robinson house, he went to “Bea’s Place” where he met Rouser and they went to find McPherson. Defendant stated that he went with the victims in a car belonging to one of them out towards Thigpen Road and that while they were riding he paid each of them $100, that being a part of what he claimed he owed them. He stated that he got out of the car because the men had made the statement that they were going to a bar and he didn’t want to go. The defendant testified that after he left McPherson and Rouser, he saw a truck with Howard and Gilmore going by and he waved them down and they gave him a ride to town. He testified positively that he did not go down the dirt road off of Thigpen Road to the point where the victims’ bodies were found. He sought to explain away the contradiction in his testimony to the jury as compared to that given the deputy sheriff with reference to having left McPherson and Rouser in the City of Hastings, by stating that he did not want the officers to know that the men had given him a ride because he would not want Howard and Gilmore to get in trouble for giving him a ride in their employer’s truck.
The defendant renewed, and the court denied, his motion for a directed verdict.
The pistol was not found, the defendant’s fingerprints were not found, although fingerprints smudged beyond identification were found about the area and in the automobile. The issue between the State of Florida and the defendant was a factual one that was presented to a jury for determination. The jury had the opportunity to observe each witness and observe the candor and the demeanor of each witness while testifying before them. The jury was the sole judge of the credit that would be assigned to the testimony of any witness who appeared before them. The jury could have believed the defendant. By its verdict, the jury branded the testimony of the defendant as being not worthy of belief. The record of the testimony presented to the jury is amply sufficient to establish that the defendant stole his victims’ money through the use of loaded dice, stole their lives through the use of a stolen pistol and he now requests this court to believe his testimony that he did not do those things; the very testimony that the jury, looking at him and hearing his testimony, refused to believe. It is not the proper function of this court to substitute its judgment for that of the jury who sat as the judge of the evidence. In Wright v. State, 269 So.2d 60, at page 61 (Fla. 1st DCA 1972), this court held:
*398 “. . .It goes without need to recite authorities that conflicts in testimony are within the jury’s province to resolve, and on appeal the reviewing court will assume the existence of that set of facts supported by the evidence which is adverse to the losing party.”
The defendant having failed to demonstrate reversible error, it follows that the verdict of the trial jury, the judgment entered and the sentence imposed should be and the same are hereby
AFFIRMED.
MILLS, Acting C. J., and SMITH, J., concur.